Filed 9/9/15  In re D.D. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re D.D., a Person Coming Under the Juvenile Court Law. | B262197<br><br>(Los Angeles County<br>Super. Ct. No. CK65016) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>SHAWNA K.,<br><br>　　　Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Debra L. Losnick, Commissioner.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Tarkian & Associates, Arezoo Pichvai for Plaintiff and Respondent.

Mother Shawna K. (Mother) appeals the dependency court's order terminating her parental rights in her son D.D. (D.). She contends the court erred because the evidence showed that she had a loving, familial relationship with D. based on her consistent visitation with him, and thus terminating parental rights would be detrimental to him under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[1] We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

1. *Detention*

D., born in June 2010, was detained on June 13, 2012 during a probation check on his father, Frederick D. (Father). Police found D. crying in his crib, wearing only a diaper. Police also found exposed needles with blood and possibly methamphetamines on the living room floor and in the shower. In the bathroom, officers found a small clear baggie of a substance resembling methamphetamine. Mother was not in the home and Father told the police that Mother often left the child with him and did not tell him where she was going. Hardcore pornography fully visible to the child was playing on the television. Father was booked for child endangerment and held without bail.

The social worker interviewed Mother, who was well-dressed and groomed. Mother was wearing sunglasses indoors but did not appear to be under the influence of drugs, nor did she smell of alcohol. Mother related that she had dropped D. off with Father, and at the time, she did not see any needles or drugs in the home. At his interview with the social worker, Father denied any drug use. Father admitted that he and Mother argued a lot, but denied hitting her. He claimed they would not argue in front of D..

At the police station after D.'s detention, the social worker observed that D. was thin. He had no bruises or rashes, and had a happy attitude. The child was not verbal, and expressed himself by shrieking, yelling, and breathing loudly. He refused all food offered to him except french fries, apple juice, chocolate and tortilla chips. The social

---

[1]     All statutory references herein are to the Welfare & Institutions Code.

2

worker believed D. had some developmental delays, including autism, but Mother denied any such problems.

Mother and Father both have extensive criminal backgrounds. Mother was arrested for possession of narcotics. Mother reported that Father has an extensive history of drug use, but denied that she knew he was currently using drugs. She believed he had completed drug counseling and was not using, and thus it was safe to leave D. with Father. Mother disclosed her own history of using methamphetamine, but asserted she did not use drugs while pregnant with D. Mother's older child, S., was the subject of a previous dependency referral, and was removed from the home and adopted in 2009. Mother blamed S.'s removal on Father's drug use, and denied any fault on her part.

D. was placed with non-relative caregiver, Victoria S. (Victoria).

DCFS's petition, filed June 18, 2012, alleged counts under section 300, subdivisions (b) and (d) that Father endangered D. based on the presence of syringes and methamphetamine in the home, and that Father had a history of illicit drug use, and Mother knew of such use and failed to protect the child. Further, Father sexually abused D. by exposing him to pornography on the television.

Mother has an extensive criminal history dating from 1996 that includes arrests and convictions for drug offenses (use, under the influence, possession) and petty crimes such as check forgery and passing bad checks, burglary, and disorderly conduct (prostitution).

DCFS recommended that D. receive mental and physical evaluations, including a developmental assessment. The risk of future harm to D. was "very high," and DCFS recommended continued detention and placement to ensure his well-being. DCFS recommended for both parents monitored visitation, individual and family counseling, parenting classes, random drug testing with treatment for any positive tests, and for Father sexual abuse counseling for perpetrators.

On June 22, 2012, the court ordered family reunification services for Father and Mother, including drug testing for Father and monitored visitation of three times a week

3

for three hours per session. The court set the matter for the disposition and jurisdiction hearing on July 18, 2012.

On July 18, 2012, DCFS filed a second amended petition alleging additional counts under section 300, subdivision (b) as to Mother based on her convictions for possession of a controlled substance, and the previous dependency proceedings for Savanna.

### 2. *Jurisdiction and Disposition*

DCFS reported that D. remained placed with Victoria. On July 11, 2012, D. obtained a referral to Regional Center due to his extremely limited speech. He could not say, "no," "mama," "dada," or "bottle," and only says, "who that," "what that," and "wow." Both parents had been visiting D. consistently, visiting once a week for a few hours each visit.

At the July 18, 2012 hearing, the court continued the matter to September 12, 2012. The parents were ordered weekly drug tests.

DCFS reported in a Last Minute Information report filed for the September 12, 2012 hearing, that the social worker met with Mother at an inpatient substance abuse treatment center, where Mother admitted that she relapsed and starting using methamphetamine after D.'s detention. Mother wished to reunify with D. She stated that on the date of D. detention, when she dropped him off at Father's, she did not see any problems or concerns. Mother did not know that Father watched pornography in front of D.

In DCFS's opinion, Mother had not been enrolled in a substance abuse program for a sufficient amount of time to address her problems. Therefore, D. should remain in foster care while Mother continued to participate in treatment, and continue counseling, and parenting education. Due to Mother's willingness to address her drug problem, DCFS recommended an additional six months of reunification.

At the September 12, 2012 hearing, the court sustained the amended petition as to counts b-1, b-2, and b-5, and dismissed the remaining counts under subdivision (b) and the count under subdivision (d) based on Father's pornography viewing. The court ordered reunification, monitored visitation and random drug testing, and set the six-month review hearing for March 13, 2013.

3. *Interim Review Hearing*

In March 2013, DCFS reported that D. had been seeing a therapist weekly since August 2012. Mother had been attending collateral parenting sessions with the same therapist. D.'s problems included distressed attachment behaviors, delayed development (speech and language), difficulty regulating his emotions and expressing his needs, and sensory regulation difficulty. Mother's therapist was concerned that Mother was in the early stages of her treatment for substance abuse, and maintaining sobriety after years of abuse required a support system for even the most dedicated participants.

DCFS's status review report stated that D. remained placed with Victoria, who had adopted his half-sister Savanna. D. had developed a close relationship with his caregiver and Savanna. D. had made significant improvements with his speech therapy, as well as his general well-being. D. had responded well to a more structured routine, had decreased bouts of yelling, was able to regulate his emotions better, follow simple instructions, and had increased his ability to speak and comprehend language. D. was eating and sleeping well, and demonstrated affection and increased socialization with his peers.

Mother had remained in constant contact with DCFS and was participating in her court-ordered services. In October 2012, Mother had left the substance abuse treatment program that she had started in August 2012. In November 2012, Mother enrolled in another program, and began individual counseling in December 2012. Mother's drug tests for November 2012 through January 2013 were clean, but she had a no show in February 2013.

Mother had not yet completed parenting classes, but was visiting D. regularly. Visits took place at Victoria's home and were monitored. Mother enjoyed the visits. Mother reported that she wanted to reunify and intended to comply with all court orders and complete her plan. Mother was no longer in a relationship with Father.

However, DCFS believed Mother appeared to want to "rush" her services and needed to resolve the safety issues for D. in returning him to her. Mother blamed Father for the current circumstance of placement and Mother needed to acknowledge her own role and responsibility in DCFS's involvement. Mother had not yet completed parenting and needed to develop the skills necessary to cope with D.'s developmental delays and ensure D.'s healthy development.

DCFS reported that Father was not in compliance with his reunification plan.

DCFS recommended that D. remain in his placement and the parents continue to receive an additional six months of reunification services.

At the March 13, 2013 hearing, the court continued the matter for a contested hearing on May 10, 2013. On May 10, 2013, the court terminated reunification services for Father.

### 4. *May 21, 2013, Continued Review Hearing*

Mother had completed her substance abuse program on March 29, 2013. Mother had initially attended parenting classes, but did not complete the program. She enrolled in another class at a different location, but withdrew because the location was too far away. At the time of DCFS's report, Mother had not enrolled in a new parenting class. On April 30, 2013, Mother reported that she was between homes and that there were NA meetings everywhere, but did not state that she was attending meetings. Mother's drug testing was sporadic, with a mix of one positive test (March 11, 2013), clean tests and no shows, with the most recent test on April 26, 2013, a no show. Mother admitted that she used drugs in March 2013, but when asked if she would attend an additional substance

abuse program, Mother declined. The social worker agreed to allow Mother additional time to consider further substance abuse treatment.

Mother was visiting D. consistently, and demonstrated affection towards D. D. appeared to enjoy the visits. Mother missed a visit in April and did not call to cancel, and Mother's phone contact was declined throughout April. The social worker noted that Mother's visits with D. declined in quality as her engagement with D. decreased. DCFS observed that Mother had not resolved her substance abuse issue and had not completed parenting classes.

DCFS recommended an additional six months of reunification services for Mother and that visitation remain monitored.

DCFS filed a status review report in advance of the August 12, 2013 hearing that stated D. remained in placement with Victoria and had a close relationship with Savanna, his half-sister. D. had made progress towards his developmental milestones. In March 2013, D. transitioned out of Regional Services and was eligible for services through Los Angeles Unified School District for speech and language issues. D.'s caregiver reported that he had benefitted from a structured environment but had some problems with hyperactivity and attention. D. was well groomed and presented as a curious, energetic and good-natured child.

Mother reported that she did not have stable housing and was staying with friends. Mother stated she was participating in drug treatment aftercare consisting of NA meetings and a 12-Step program, and that she spoke to her sponsor daily, but Mother had not provided verification of her attendance. Mother had one positive drug test, and four no shows. Mother claimed the May 2013 positive result was in error. Mother also claimed she had not received information regarding further parenting classes, although DCFS had provided her with such information. During May 2013, Mother's therapists had attempted to follow up with Mother regarding further classes but had been unsuccessful.

DCFS observed that Mother had received a reasonable amount of time to comply with court-ordered services but had failed to do so. Parenting instruction was essential

7

for Mother to ensure she could become a reliable caregiver for D. Mother had not completed an additional four sessions of her therapy after her drug treatment program ended, having attended only six sessions. Mother's therapist considered such attendance insufficient to address Mother's addiction issues. Mother had refused to receive additional substance abuse therapy.

DCFS identified adoption as the permanent plan should reunification fail. DCFS initiated concurrent planning in January 2013, but an adoption home study of Victoria could not be processed because there was an ICPC request in progress regarding D.'s paternal great-grandmother, Fannie, in Alabama.[2] Victoria was identified as a secondary plan for permanency.

In July 2013, Mother requested additional service referrals. However, Mother told DCFS that noncompliance with her program was not her fault.

On August 12, 2013, the court continued the matter to September 17, 2013, and ordered a supplemental report to address the parents' educational rights.


5. *September 17, 2013, Continued Review Hearing*

DCFS's report stated that D. remained placed with Victoria. D. had commenced a Head Start program and received IEP testing and was found eligible for special education services. Mother informed DCFS that she was enrolled in a ten-week parenting program that commenced on August 27, 2013, and asserted she completed her parenting program because she completed three classes and was able to transfer seven classes from her prior agency. DCFS learned that the agency would not have credited Mother's classes if it had known Mother completed them the prior year. Mother's most recent drug tests since June 2013 were clean or no shows. DCFS observed that Mother's substance abuse and

---

[2]     Mother sought a placement with Fannie based on the Interstate Compact on Placement of Children (Fam. Code, § 7900 et seq.; Cal. Rules of Court, rule 5.616) (ICPC). The home study for Fannie was later approved, but DCFS later recommended that D. remain with Victoria due to the disruption any move to Alabama would cause.

parenting issues remained unresolved. Mother's missed drug tests suggested that she continued to struggle with addiction.

At the hearing, the court continued reunification services for Mother, and set the matter for a permanency planning hearing on January 6, 2014.

6. *18-Month/Permanency Planning Review*

DCFS's report prepared for the January 6, 2014 hearing stated that D. remained placed with Victoria. Victoria had terminated a visitation session on November 11, 2013, due to Mother's inappropriate anger directed at another foster child in the home. Mother became very disruptive when D. called her "Shawna" instead of "Mommy." She yelled at another foster child who referred to D. as the child's brother, and who played with D.'s toys. Mother was angry that D. had a nickname, "[D.]-Alan," although "Alan" was D.'s middle name. Victoria informed DCFS she did not want Mother's visits with D. to be held in the foster home, and that she did not want to monitor the visits. Mother was upset that D. was becoming attached to the foster mother.

The day after Mother's disruptive visit, Victoria reported that D. had a difficult day at school. On December 4, 2013, Vitoria, Mother, and the social worker had a meeting to resolve any issues. Victoria agreed to call D. only "[D.]" Mother was advised to discuss any problems she had with Victoria, and not approach and yell at the children. Victoria agreed to monitor future visits for Mother, but Mother stated she wanted another monitor, so Edith T. agreed to be the monitor.

On December 9, 2013, the social worker spoke to Mother about On Demand drug testing and Mother stated, "I'm not scared of testing." Mother's speech was rapid, pressured, and demanding. Mother stated she had a new job, but her boss was not understanding about taking time off for matters related to D.'s dependency proceedings. When asked if changing the testing site would help, Mother responded, "I have done enough testing. Can't you just look over the past tests. I am not scared."

As of the date of the report, Mother had not completed parenting and counseling. The counselors had been available to provide services to Mother for the past 18 months, but Mother failed to complete her sessions. Mother's therapist reported that Mother resumed therapy in mid-October 2013. The therapist was concerned with her poor physical health, poor decision making, lack of insight, and that she continued to blame Father for D.'s dependency proceedings. Mother's most recent drug tests in December 2013 were clean, although she had a no show in November 2013. Mother had not started Dyadic counseling with D., although she attended an initial assessment on November 21, 2013. Mother's therapist was concerned with Mother's commitment to sobriety given that she did not have a sponsor. Mother was affectionate to D. at visits, giving him hugs and kisses and expressing her love for him.

7. *March 25, 2014 Review/Permanency Planning Hearing*

DCFS reported that D. remained placed with Victoria. Mother was scheduled to begin Dyadic therapy with D. on March 13, 2014. Mother's most recent drug tests were negative.

DCFS recommended termination of reunification services for Mother.

The court continued the matter to May 13, 2014.

8. *May 13, 2014, Hearing*

On May 9, 2014, Victoria filed a De Facto Parent Request based upon her participation in D.'s life as his primary caregiver. Victoria and D. had been regularly attending in-home therapy together since August 2012. D. had demonstrated significant improvement in his language and communication skills. Mother had been attending collateral weekly sessions as well since March 2013.

DCFS reported that D. remained placed with Victoria. Victoria reported on April 21, 2014, that a visit on March 26, 2014, had gone well, but Mother had missed three other monitored visits.

10

DCFS filed a Last Minute Information on May 13, 2014, stating that D.'s interests would best be served by remaining in his current placement.

At the hearing, the court set a hearing for Victoria's De Facto Parent Request for June 5, 2014, and set the permanency planning hearing for September 9, 2014. The court terminated Mother's reunification services.

On June 5, 2014, the court granted Victoria's De Facto Parent Request, and limited Mother's educational rights.

The prospective caregiver assessment for Victoria stated that she had adopted Savanna in 2009, and had a foster child aged eight in the home. Victoria lived in a four-bedroom home. Victoria wished to adopt D., and her home study was completed. D. had made progress in his social and emotional development, but still had some delays in his social skills. D.'s cognitive skills were developing, but at times, he would cry or scream to avoid clean-up time or in order to get his way, and needed encouragement to complete his tasks. His language skills were improving.

Mother's therapist reported that since beginning Dyadic therapy in February 2014, Mother had been attending sessions and had made significant progress in strengthening her bond with D. and had learned to read his cues when he was distressed.

DCFS recommended that parental rights be terminated.

At the hearing, the matter was rescheduled to October 27, 2014.

9. *October 27, 2014, Hearing*

DCFS's report prepared for the October 27, 2014 hearing stated that D. was bonded to Victoria and was doing well in his placement. D. engaged in many activities in which Savanna was included. D. had some difficulties with emotional regulation but Victoria was able to manage him. D. was participating in Dyadic therapy with Mother; however, the therapist did not believe it would be beneficial to continue therapy with Mother as her attendance was poor. Mother had not been consistent in her visitation during the last two months.

11

At the hearing, the court ordered individual therapy for D., and the matter was continued to January 13, 2015.

10. *January 13, 2015, Permanency Planning Hearing*

Mother argued that she was within the section 366.26, subdivision (c)(1)(B)(i) exception to the termination of parental rights based upon her regular visitation with D. that occurred up to three times a week, and at those visits, Mother was more than a familiar figure that played with him. D. would benefit from continuing the relationship with Mother, who had worked to maintain her bond with D. during his time in foster care.

Mother testified that for the past six months, she had visited D. at least once weekly. The visits lasted two to three hours. Often they took place at a park or a Chuck E. Cheese. Mother would play with D. at the park and she would play with his Hot Wheels with him. She would bring crackers and juice. Sometimes they watched television and worked on his homework. In her Dyadic therapy class she interacted with D. and learned how to handle him in various situations. Mother asserted that she would be able to provide necessary care for D. D. told her that he wanted to come home, and called her "Mommy."

DCFS pointed out that Mother's Dyadic therapy had been terminated because she was often late to the sessions, and her lack of consistency affected D. Mother had missed two recent drug tests. On the other hand, D. was adoptable and had an adoptive home ready. Victoria's home had an approved home study and she wished to adopt him.

The court found that although Mother had visited with D., she had missed a number of visits. "At this point in time the benefit of permanence is not outweighed by any detriment that the child would receive by terminating rights. The court is unable to find any exception applies." The court found that Mother had been a "friendly visitor, along the lines of an aunt or an uncle but not in the shoes of a parent." The court terminated parental rights and freed D. for adoption.

12

## DISCUSSION

Mother argues that the beneficial relationship exception of section 366.26, subdivision (c)(1)(B)(i) applies based on her consistent and frequent visitation with D. at which she demonstrated she occupied a parental role in his life. She changed his diapers; they watched television together; she assisted him with his homework; they played in the park; and she participated in Dyadic therapy with him. D. expressed his wish to her that he could come home with her, and her bond with D. remained strong throughout the dependency proceedings. DCFS responds that Mother's relationship with D. failed to rise to the level that would outweigh the benefits D. would gain through adoption: Mother's visits never progressed past monitored visitation; Mother was inconsistent in her visits; Mother did not stand in a parental role in D.'s life because the emphasis in her visits with him was on play; on the other hand, D. has lived with Victoria since the inception of the case, and D.'s attachment to Victoria was strong.

At a section 366.26 hearing, when reunification services have been terminated and adoption is likely, parental rights must be terminated unless the objecting parent satisfies the burden of proving that termination of parental rights would be detrimental to the minors under one of the exceptions listed in section 366.26, subdivision (c). (*In re S.B.* (2008) 164 Cal.App.4th 289, 297.) Section 366.26, subdivision (c)(1)(B)(i) provides that parental rights are not to be terminated when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship".

To meet the burden of proof for this statutory exception, the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) The parent must show he or she occupies a parental role in the child's life that results in "'a significant, positive, emotional attachment from child to parent.' [Citation.]" (*In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary

13

case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

In order for the beneficial relationship exception to apply, Mother must also demonstrate that her "relationship [with D.] promotes [his] well-being . . . to such a degree as to outweigh the well-being [D.] would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) In other words, the burden is on Mother to show that her parent-child relationship with D. is such that he will be greatly harmed by the termination of her parental rights, and thus she has overcome the presumption in favor of adoption. (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 853-854.) Implicit in this standard is that "a parental relationship is necessary for the exception to apply, not merely a friendly or familiar one. [Citations.]" (*In re Jasmine D., supra*, 78 Cal.App.4th at p. 1350.)

In sum, the beneficial relationship exception "does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D., supra*, 78 Cal.App.4th at p. 1348.) "The reality is that childhood is brief; it does not wait while a parent rehabilitates himself or herself. The nurturing required must be given by someone, at the time the child needs it, not when the parent is ready to give it." (*In re Debra M*. (1987) 189 Cal.App.3d 1032, 1038.)

We review the court's finding whether a parental relationship existed under the substantial evidence test, whereas the abuse of discretion standard applies to the determination of whether that relationship is sufficiently important that the detriment from its termination would outweigh the benefit of adoption. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315; accord, *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.)

Here, Mother asserts a parental bond was established, and points to her visitation with D., where she interacted with him by relaxing, reading, watching television, and snacking. She assisted him with his homework. She participated in Dyadic therapy with

14

him.  They often went to the park on their visits, and he would call her "Mommy."  They exchanged hugs and kisses, and were affectionate toward each other.  After participating in Dyadic therapy, the therapist had observed that Mother had improved in her interaction with D., and learned to read his cues when distressed.

While we agree with Mother that she had a bond with D. and there is an attachment, she has failed to demonstrate that the bond was of such a character that it outweighed the benefits to D. in his prospective adoptive home with Victoria.  While in Victoria's care, D. had received necessary treatment for his developmental delays, had made progress, and was experiencing a stable and happy home life with Savanna.  On the other hand, Mother had not progressed beyond monitored visitation, had demonstrated that she still was likely using drugs, and had not completed the necessary services for D. to be returned to her.  We find no error.

## DISPOSITION

The Order of the Superior Court is affirmed.


KIRSCHNER, J.[*]


We Concur:


TURNER, P.J.


MOSK, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.